# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 100

APRIL TERM, A.D. 2014

*August 7, 2014*

CHRISTOPHER A. GRAYBILL and
TAMI J. GRAYBILL, Husband and
Wife, CHRISTOPHER A. GRAYBILL,
Individually, TAMI J. GRAYBILL,
Individually, HENRY PRADO and
SIMONA PRADO, Husband and Wife,

Appellants
(Plaintiffs),

v.                                                            S-13-0252

TRACY E. LAMPMAN and NORMA
J. LAMPMAN, Husband and Wife,

Appellees
(Defendants).

*Appeal from the District Court of Goshen County*
*The Honorable Keith G. Kautz, Judge*

*Representing Appellants:*
   Brian D. Artery and Rex E. Johnson of Sherard, Sherard, Artery & Johnson, Wheatland, Wyoming.  Argument by Mr. Artery.

*Representing Appellees:*
   Nathaniel S. Hibben, Attorney at Law, Torrington, Wyoming

*Before BURKE, C.J., and HILL, KITE\*, DAVIS, and FOX, JJ.*

*\* Chief Justice at time of oral argument*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]   This is a boundary dispute between property owners in Torrington, Wyoming. Henry and Simona Prado purchased their lot in 1966, mistakenly thinking that it included a strip of land beyond its actual eastern boundary. Roughly twenty years passed as the Prados continued to believe the land was theirs and used it accordingly. In the late 1980s, Tracy and Norma Lampman bought the tract immediately to the east of the Prados that included the narrow parcel, at least according to recorded documents. While the owners of each lot apparently believed they owned the strip of land, another score of years passed before their conflicting beliefs became evident. In 2011, Christopher and Tami Graybill entered into a contract for deed with the Prados, took possession of their lot, and began using the disputed parcel. A 2011 survey established the true property line, and the Lampmans fenced the parcel off, triggering this lawsuit.

[¶2]   Appellants claimed to own the disputed area by adverse possession. The district court found that they did not and quieted title in the Lampmans. We reverse and remand for further proceedings.

## ISSUES

[¶3]   Appellants present the following issues:

> 1.   Did the trial court err when it held that the Prados did not adversely possess the disputed tract from 1966 to 1976, and if so, did title vest in the Prados as of 1976?

> 2.   If title to the disputed tract vested in the Prados in 1976, were the Prados subsequently divested of title?

[¶4]   The Lampmans pose only one question:

> 1.   Did the District Court correctly determine that Appellants failed to adversely possess the disputed property?

## FACTS

[¶5]   The Prados purchased their lot from relatives in 1966. It is described as the South 1/2 of Lot 17, Second South Torrington Subdivision, Goshen County, Wyoming. They immediately moved in and lived on the property for the next forty-plus years, raising five children there.

[¶6]   It is undisputed that there was a fence separating the Prados' lot from the adjoining tract to the east when the Prados bought it. This adjoining tract would be purchased by

1

the Lampmans roughly twenty years later. The fence consisted of small posts and a single barbed wire. The Prados believed the fence was on the boundary between their lot and the adjoining eastern property. Mr. Prado testified that there has been a fence of some kind in that same location since they moved in. However, the fence ultimately turned out not to be on the boundary contained in the recorded property description.

[¶7] The fence Prados believed to be on their boundary is represented as the "historic fence" on the following image:



(Dashed line added). As the image illustrates, although the disputed parcel lies on the Prados' side of the fence, it is actually part of the western portion of the Lampmans' lot based upon the descriptions of both properties. It extends roughly 54 feet east of the

actual boundary line at the south end, and about 38 feet at the north, and encompasses .3522 acres. An aerial photograph depicts the area:



Prado Lot          Disputed Parcel  Fence    Lampman Lot

[¶8]    After moving in in 1966, the Prados treated the disputed parcel as part of their property. It was covered in grass and looked like it was part of their lot.[1] Mr. Prado habitually watered and cut the grass/vegetation on his lot and the disputed parcel,

---

[1] Aerial photographs included in the record, which were taken in 1976 and 1990 respectively, demonstrate a distinction in vegetation between the Prados' lot including the disputed parcel, and the Lampmans' lot along a line where the Prados first observed the fence in 1966. These photographs confirm that the disputed parcel has always been on the Prado's side of the fence.

maintaining it as one piece of property. When the grass and vegetation grew tall enough, he had other people cut it and bale the clippings for feed.

[¶9] The Prados used the disputed parcel as part of their property for family gatherings and functions, including baptisms, confirmations, first communions, birthdays, graduations, holidays and church functions. They parked vehicles, set up a baseball field, and placed tables and port-a-potties for parties on it. While the Prados did not build any permanent structures on the tract, they thought the parcel was theirs and used it consistent with its character.

[¶10] It is uncontoverted that the Prados never sought permission from anyone to use the disputed area from 1966 on. When the Prados moved onto their lot in 1966, a family lived on the lot to the east, but the two families never really became acquainted. The Prados had no discussions with that family concerning the fence line between the two lots, nor did they ask for permission to use the disputed tract as they did. The family did not object to the Prados' use of the disputed parcel.

[¶11] In 1989, the Lampmans bought the lot to the east of the Prados. *See* aerial image, *supra*, ¶ 7. Their property is described as the South 1/2 of Lot 18, Second Addition, South Torrington Subdivision, Goshen County, Wyoming. The Lampmans recalled finding remnants of an old fence when they purchased their property, but they claim that this one was exactly in line with the true platted boundary, which was established by a much later survey. This other antiquated fence, which was mostly buried in the dirt as the Lampmans recalled, ran north to south for approximately 150 feet. Mr. Lampman testified that he believed the remnants of this other fence to be the true boundary line when he and his spouse purchased the parcel.

[¶12] On the other hand, Mr. Prado testified that he never observed any bits and pieces of an old fence where Mr. Lampman claimed to have found one. Aerial photos taken in 1976 and 1990 also do not show a fence or remains of one in that area. Whether there was a fence at the location of the platted boundary line after 1989 is therefore subject to conflicting evidence. The Lampmans testified that they removed the fence remnants they claim to have found on the true boundary without telling the Prados about them.

[¶13] As to the fence that the Prados observed in 1966 and believed to reflect the boundary separating the two lots, Mrs. Lampman saw some posts in the same location.[2] After moving in, Mr. Lampman constructed and maintained a fence made out of railroad ties, chain link, and panels in the same place Prados had seen one in 1966, the location of which is unmistakably reflected in the aerial photos described above. Thus, the fence constructed by Mr. Lampman, which still exists in this exact location today, lies on the eastern edge of the disputed parcel, placing the disputed parcel on the Prados' side.

---

[2] Mr. Lampman's brother, Ronald, also recalled a fence always being in this same location.

[¶14]  The Lampmans asked Mr. Prado for permission to graze horses on the Prados' land during the summers from 1989 through 2006.[3]  The evidence is in conflict as to what permission Lampmans asked for and what permission Prados thought was given.  The Lampmans testified that they only sought permission to graze on the northern part of the Prado tract, and not the now-disputed area.  Mr. Prado interpreted their request as seeking to graze everything on his side of the fence, including the disputed parcel.  The parties' discussions evidently passed like ships in the night.

[¶15]  Sometime in the early 1990s, the Lampmans constructed a garage on their property.  According to them, they took dirt from the disputed parcel and moved it to the location of the garage to ensure that the foundation was level.  Mr. Lampman testified that he used a road grader and a pay loader to remove the dirt from the southern and middle portions of the parcel, taking approximately six inches of top soil.  The Lampmans denied asking the Prados for permission to remove the dirt.  Mr. Prado testified that he did not recall them removing any dirt from the disputed parcel.

[¶16]  In approximately 2006, the Lampmans occasionally parked their semi-trucks on a portion of the disputed parcel.  Messrs. Lampman and Prado discussed parking the trucks on the Prados' side of the fence, and Mr. Prado again interpreted this conversation as a request by Mr. Lampman to use the disputed parcel.  Mr. Lampman testified that he just intended to ask whether his vehicles made too much noise or were becoming a nuisance, and not to seek permission to use the parcel.  After the trucks were removed from the disputed parcel, Mr. Prado reseeded and watered the area to restore the grass where it had been disturbed.

[¶17]  The Prados moved to a different house in Torrington in 2006.[4]  After that, they occasionally rented their lot until 2011.  During this period, Mr. Prado and at least one tenant continued to mow and water his tract, including the disputed parcel.  Mr. Lampman claimed that he and his grandchildren mowed the disputed parcel during this period as well.  The Lampmans also stopped grazing their horses on the parcel during this time because they wanted to avoid problems with the Prados' tenants.

[¶18]  In 2011, the owners of the lot west of the Prados' property, the Graybills, approached Mr. Prado about purchasing his property.  The Graybills wanted to expand their recycling business, which they had been running on their lot.  The Prados agreed to

---

[3] The duration of grazing by the Lampmans' animals was very short due to the small area.  The area on the Lampmans' side of the fence was generally de-vegetated; whereas the area on the Prados' side of the fence was generally green and vegetated.  *See* aerial image, *supra*, ¶ 7. Because of the grazing, the areas on the Prados' side did not need to be mowed as much after the Lampmans moved in.

[4] Shortly thereafter, in approximately May 2007, the Prados and Lampmans discussed the possibility of the Lampmans buying the Prados' lot.  A contract was drafted but ultimately the parties did not execute it, for reasons not clear in the record.  No survey was conducted at this time.

sell, and the parties entered into an agreement whereby the lot would be purchased on installments under a contract for deed. The agreement described the Prados' lot as indicated above, and Mr. Prado thought the description included the disputed parcel.

[¶19] Mr. Graybill testified that he also thought the disputed parcel was part of the Prados' lot because of the fence Mr. Lampman built. He testified that he had no reason to believe that the boundary separating the Prados' and Lampmans' properties was not where the fence was located. The property was not surveyed when the agreement was entered into or when the Graybills took possession.

[¶20] After taking possession, the Graybills began constructing a circular drive, the eastern part of which turned out to be on the disputed parcel. They also parked vehicles and equipment on it without asking for permission to do so. The Lampmans did not say anything to the Graybills or Prados about the Graybills' use of the disputed parcel or about the circular drive. Mr. Lampman did, however, recall telling a construction worker building the drive that it was partially on his property. No such conversation was related to the Graybills or Prados.

[¶21] Around November of 2011, the Graybills hired Panhandle Land Surveying to survey land they planned to use for a trailer park in the same south Torrington subdivision. The survey found discrepancies of varying degrees between the existing fence lines and platted boundary lines, and that those discrepancies affected several lots, including those owned by the Graybills and Lampmans. Panhandle sent letters to the property owners impacted by this discovery, proposing to resubdivide in order to make the existing fence lines the legal recorded boundaries.

[¶22] The Lampmans objected to the Panhandle proposal, and they hired Benchmark Surveying to conduct a survey of their tract. Benchmark's findings were essentially the same as those of Panhandle. After the surveys were complete, Mr. Lampman put a fence on the surveyed boundary between his and the Prado/Graybill lot, thus cutting off the eastern portion of the circle drive constructed by the Graybills on the disputed parcel.

[¶23] The Graybills and Prados filed an action against the Lampmans asserting claims for (1) declaratory relief, (2) establishment of title through adverse possession, (3) quiet title, (4) ejectment and (5) injunctive relief. All of these claims boil down to a contention that title of the disputed parcel was vested in the Prados by adverse possession, and that title was then conveyed to the Graybills. The Lampmans timely answered and counterclaimed that their neighbors did not adversely possess the parcel and that they had suffered damages as a result of the circular drive built in part on the disputed tract.

Although the counterclaim is not entirely clear, it can be read to claim not only record title, but in the alternative, to claim title by adverse possession.[5]

[¶24] The district court held a bench trial and issued a decision letter ruling that Appellants had not proven the elements of adverse possession. It then quieted title in the Lampmans and granted them injunctive relief excluding Appellants from the disputed parcel and directing the Graybills to remove their personal belongings and circular road from that parcel. An Order and Judgment incorporating the decision letter was then entered. This timely appeal followed.

## STANDARD OF REVIEW

[¶25] The following standards guide our review of a district court's decision following a bench trial:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In considering a trial court's factual findings, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law. The district court's conclusions of law are reviewed *de novo*.

*Helm v. Clark*, 2010 WY 168, ¶ 6, 244 P.3d 1052, 1056 (Wyo. 2010) (citations omitted).

---

[5] The parties' pretrial statements were not designated as part of the record on this appeal, but we were assured at oral argument by Lampmans' counsel that his clients did make an adverse possession claim. In his opening statement at trial, Appellants' attorney indicated that he expected such a theory to be presented. This theory may explain why evidence of conduct after 1989 was presented.

**DISCUSSION**

*Prima Facie Case for Adverse Possession*

[¶26] Appellants argue that their position is now and always has been that the Prados began adversely possessing the disputed parcel in 1966, that they were vested with title in 1976, and that the title so established was never divested. They contend that the district court erred by not analyzing their claim in this time frame, and that it incorrectly presumed that the Prados' use was permissive. After reviewing the entire record and studying controlling case law, we agree with Appellants that the undisputed evidence during the time from 1966 to 1989 established a *prima facie* case for adverse possession.

[¶27] To establish adverse possession, Appellants must show actual, open, notorious, exclusive and continuous possession of the disputed parcel which is hostile and under claim of right or color of title. *Helm*, ¶ 8, 244 P.3d at 1057. Possession must be for the statutory limitation period of ten years.[6] The test for adverse possession in a mistaken boundary case imposes shifting burdens upon the parties:

> When there is no clear showing to the contrary, a person who has occupied the land for the statutory period, in a manner plainly indicating that he has acted as the owner thereof, is entitled to a presumption of adverse possession; and the burden shifts to the opposing party to explain such possession. However, if a claimant's use of the property is shown to be permissive, then he cannot acquire title by adverse possession.[7]

    *Actual*

---

[6] *Murdock v. Zier*, 2006 WY 80, ¶ 10, 137 P.3d 147, 150 (Wyo. 2006); Wyo. Stat. Ann. § 1-3-103 (LexisNexis 2013) ("An action for the recovery of the title or possession of lands, tenements or hereditaments can only be brought within ten (10) years after the cause of such action accrues.").

[7] *Helm*, ¶ 8, 244 P.3d at 1057; *see also Hutchinson v. Taft*, 2010 WY 5, ¶ 13, 222 P.3d 1250, 1253 (Wyo. 2010); *Murdock*, ¶ 15, 137 P.3d at 151; *Davis v. Chadwick*, 2002 WY 157, ¶ 9, 55 P.3d 1267, 1270 (Wyo. 2002); *Hovendick v. Ruby*, 10 P.3d 1119, 1122 (Wyo. 2000); *City of Rock Springs v. Sturm*, 39 Wyo. 494, 517, 273 P. 908, 915-16 (1929) ("[I]t is a reasonable rule that, when a man has occupied a piece of ground, though under a mistaken belief as to the true boundary, for the period prescribed by law, openly, notoriously, exclusively, and in a manner plainly indicating that he acted as owner thereof, the presumption should be, in the absence of explanatory circumstances showing the contrary, that he occupied the land adversely and under a claim of right, casting the burden of explaining such possession upon the person who disputes his right.").

[¶28] Actual possession or occupancy is fundamental in any claim to land by adverse possession.[8] No particular act is required to establish actual possession; rather, the acts required depend upon the character of the land and the use that can reasonably be made of it.[9]

[¶29] The disputed parcel can fairly be characterized as in a rural residential area. The Prados began to maintain and use the contested parcel as they did the rest of their property in 1966. It was undisputed that from 1966 until at least 1989, no one other than the Prados maintained or made use of it. *See supra*, ¶¶ 5-11. The district court specifically found that "[n]o evidence indicated that anyone other than [the] Prados used the disputed tract from 1966 until 1989." The Prados' actions were conspicuous and consistent with their mistaken belief that the parcel was part of their lot. We find that the Prados actually and continuously possessed the disputed property for a period of at least 10 years, beginning in 1966.

### Open and Notorious

[¶30] The acts of dominion over land claimed to be adversely possessed must be so open and notorious as to put an ordinarily prudent owner on notice that the land is being used by another as his or her property.[10] Put another way, if the actions of the claimant openly and overtly demonstrate control or use that is consistent with the type of land in dispute, this element is satisfied. Although the enclosure of land may render the possession of land open and notorious, *see Davis*, ¶ 9, 55 P.3d at 1270, it is not the only way in which possession can be open and notorious.[11]

---

[8] *Sturm*, 39 Wyo. at 502, 273 P. at 910 ("Courts are agreed that when actual possession is had, as in the case at bar, color of title is not necessary unless expressly required by statute."); *Murdock*, ¶ 13, 137 P.3d at 151; *Mader v. Stephenson*, 501 P.2d 1253, 1254 (Wyo. 1972); 3 Am. Jur. 2d *Adverse Possession* § 2 (explaining that adverse possession is "possession in opposition to the true title and record owner—a possession commenced in wrong and maintained in right.").

[9] *See Davis*, ¶ 11, 55 P.3d at 1271 ("We have recognized that adverse possession can be established by the pasturing of livestock during the growing season within a substantial enclosure."); *Sowerwine v. Nielson*, 671 P.2d 295, 302 (Wyo. 1983) ("We have held that if a claimant occupies land and makes the only practical use of it for which it is suited, that is sufficient to satisfy the requirement of continuous possession."); *Kranenberg v. Meadowbrook Lodge, Inc.*, 623 P.2d 1196, 1199 (Wyo. 1981) (involving a residential use up to a fence as opposed to grazing and finding that "[t]he possession and use of the entire piece of property were no different from the Kranenbergs' occupation of that part of the parcel awarded appellant.").

[10] *Braunstein v. Robinson Family Ltd. P'ship, LLP*, 2010 WY 26, ¶ 18, 226 P.3d 826, 833-34 (Wyo. 2010) (noting factors that may be important in determining whether the elements for adverse possession are satisfied); 3 Am. Jur. 2d *Adverse Possession* § 58 ("For purposes of an adverse possession claim, open and notorious possession is satisfied by visible acts of ownership exercised over the property or by such conduct as is sufficient to put a person of ordinary prudence on notice of the fact that the land in question is held by the claimant as his or her own.").

[11] *Braunstein*, ¶ 18, 226 P.3d at 833-34; *see also* 3 Am. Jur. 2d *Adverse Possession* § 60.

[¶31] There have been circumstances where erecting buildings on the land, planting groves or trees on the land, as well as maintaining and improving the property, satisfy this element. *See* 3 Am. Jur. 2d *Adverse Possession* § 60. "Whether the occupation of an adverse possessor is sufficiently open and notorious to constitute notice to the owner is a question of fact in each case and depends on the particular land and its condition, character, locality, and appropriate use." *Id.*

[¶32] The district court correctly concluded that the Prados' use of the disputed parcel was "open and notorious in that anyone, including the owners of the [Lampmans' lot], could and should have seen it." The Prados maintained the parcel by watering and mowing it, and they used it as they did the rest of their property, including for numerous family functions. There is no evidence that anyone other than the Prados openly and notoriously used or maintained the disputed property from 1966 to 1989. We therefore conclude that the Prados' possession was continuously notorious for a period of at least 10 years beginning in 1966.

*Exclusive*

[¶33] Exclusive possession requires that Appellants show an exclusive dominion over the disputed parcel and an appropriation of it to their own use and benefit. However, "exclusive" for purposes of adverse possession does not mean absolutely exclusive, but only such use as would be expected of an owner under the circumstances.[12]

[¶34] In concluding that the Prados' use of the parcel was not exclusive, the district court found that the Prados did not construct or maintain a fence to exclude others from the disputed tract. However, it is not necessary that a party prove a complete enclosure.[13] The disputed parcel has always been included within what would appear to be the Prados' property: currently by a fence built by the Lampmans; a tree line; and a distinction in vegetation—all of which under these circumstances are adequate to establish exclusivity. The Prados never needed to build a fence, as they did not graze cattle or have any other reason to do so. Their use of the disputed parcel is consistent with that which would ordinarily be exercised by an owner in using land to the exclusion of others.

---

[12] *Cook v. Eddy*, 2008 WY 111, ¶ 25, 193 P.3d 705, 713 (Wyo. 2008); *Davis*, ¶ 15, 55 P.3d at 1273; 3 Am. Jur. 2d *Adverse Possession* § 61 ("Exclusive possession can be established by acts, which at the time, considering the state of the land, comport with ownership, that is, such acts as would ordinarily be exercised by an owner in appropriating the land to his or her own use and the exclusion of others.")

[13] *See e.g.*, *Davis*, ¶ 12, 55 P.3d at 1271-72 ("The term 'substantial enclosure' does not refer to the area enclosed by a fence. Instead, we use the term to refer to the extent and nature of the enclosure of the disputed property. In other words, the term 'substantial enclosure' means whether or not the land adversely claimed is enclosed in a manner that puts the title owner on notice of the adjoining landowners' adverse claim of ownership and the extent of that claim (*i.e.*, over what specific lands the adverse claimant is asserting ownership).").

[¶35]  The district court also erred by expanding the time frame to the period after the Lampmans purchased their lot in 1989.  The appropriate point in time for purposes of analyzing Appellants' adverse possession claim was decades earlier, and the undisputed evidence is that from 1966 through at least 1989, the Prados' possession was exclusive, as the record confirms that they did not share possession of the parcel with the Lampmans' predecessors in interest or anyone else.  The Prados alone cared for the disputed parcel and used it as if it was their own throughout those years.  At best, the Lampmans would have begun using the property in 1989. Prior to that time, there is no evidence in the record that anyone other than the Prados exercised exclusive dominion over the disputed parcel.  We conclude that the Prados' possession was continuously exclusive for a period of at least 10 years beginning in 1966.

### *Hostile*

[¶36]  "Possession is hostile when the possessor holds and claims property as his own, whether by mistake or willfully." *Murdock*, ¶ 10, 137 P.3d at 150.  The term "hostile" in the context of adverse possession is not to be interpreted as ill will or to require action akin to lining up Spartans at Thermopylae to prevent the return of one holding legal title; rather, it is an assertion of ownership adverse to that of the record owner.  The purpose of requiring possession to be hostile is to give clear notice to the legal owner that his or her ownership is in jeopardy, so that action to protect title can be taken within the statutorily prescribed period.[14]  As one respected secondary authority has clearly and cogently explained:

> To be hostile, the claimant's possession must be clear, distinct, and unequivocal.  It must convey the clear message that the possessor intends to possess the land as his or her own.  Hostile possession must be such as to import a denial of the owner's title or oust the owner from the land. A claimant's possession of land, to be hostile, thus must be incompatible with or in defiance of the rights of others.

3 Am. Jur. 2d *Adverse Possession* § 40.

[¶37]  The evidence here clearly indicates that the Prados believed that the disputed property was theirs, and treated it as such from 1966 to 1989, and arguably well beyond. While the district court considered the timeframe after the Lampmans purchased their lot in 1989, there is no evidence that any of the previous owners of that lot gave the Prados permission to use the disputed property, or that the Prados' use was anything but hostile.

---

[14] *Kranenberg*, 623 P.2d at 1199 ("The chief concern should be whether he held dominion over the property in such a manner as to alert the owner of the danger that his property may be lost to another.").

Accordingly, we must conclude that the Prados' possession was continuously hostile for a period of at least 10 years, starting in 1966.

### Continuous

[¶38] Title cannot be acquired without the concurrent and continuous existence of each element of adverse possession for the required ten year period. The term "continuous" for purposes of adverse possession equates to possession for the statutorily required period, and that possession must be uninterrupted or maintained without break or interlude. *Murdock*, ¶¶ 11-13, 137 P.3d at 150. As we have already concluded, Appellants established continuity of all the other elements of adverse possession for a period of at least 10 years, from 1966 until 1989, and perhaps beyond.

[¶39] In sum, we conclude that Appellants presented the requisite *prima facie* case, and that the Prados are presumed to have adversely possessed the disputed parcel. The burden then shifts to the Lampmans to explain that possession and show that it was permissive. A review of the record confirms that the Lampmans have not satisfied their burden to show that the Prados' use from 1966 to 1989 was permissive. Thus, title of the disputed parcel vested in the Prados in 1976, and they were entitled to use it as they could any other real property they owned.[15]

### Adverse Repossession

[¶40] Once real property is vested by adverse possession, title can only be divested by conveyance, descent or operation of law.[16] Because the district court held that Appellants did not establish a *prima facie* case of adverse possession, it did not make findings of fact and conclusions of law concerning whether the Lampmans adversely possessed the disputed parcel back from the Prados at some point after 1989. For instance, whether the fence that the Lampmans built separating the disputed parcel from their property, *see* aerial image, *supra*, ¶ 7, is a boundary fence or merely one of convenience is a question of fact that must be addressed by the district court.[17] So is the crucial issue of whether Lampmans proved the elements of adverse possession for the statutory period. We cannot resolve that issue in this appeal, and we will therefore remand so that the district

---

[15] *Sanders v. Lidle*, 674 P.2d 1291, 1293-94 (Wyo. 1984) (after title vests the adverse possessor is free to treat the property the same as any other real property they own and is not required to bring a quiet title action); 3 Am. Jur. 2d *Adverse Possession* § 235 ("An adverse possession of land for the period of limitation operates of itself as a grant of all adverse title and interests to the occupants. No judicial action is necessary to effectuate transfer.").

[16] *Sanders*, 674 P.2d at 1293 ("After title is vested it can only be divested by conveyance, descent or operation of law."); *Meyer v. Ellis*, 411 P.2d 338, 340 (Wyo. 1966) (same).

[17] *See Helm*, ¶ 12, 244 P.3d at 1058; *Braunstein*, ¶ 18, 226 P.3d at 834; *Cook*, ¶ 9, 193 P.3d at 709; *Davis*, ¶ 9, 55 P.3d at 1270; *Hovendick*, 10 P.3d at 1123; *Kimball v. Turner*, 993 P.2d 303, 306 (Wyo. 1999); *Mader v. Stephenson*, 501 P.2d 1253, 1254 (Wyo. 1972).

court may decide whether Lampmans adversely repossessed the disputed parcel after they moved onto the adjacent property in 1989.

## CONCLUSION

[¶41]   Based on our *de novo review* of the district court's conclusions of law, and giving due weight to its factual findings, we find that Appellants established their adverse possession claim by a preponderance of the evidence, and we therefore conclude that the district court erred in finding to the contrary.  However, because the district court did not determine whether the Lampmans adversely repossessed the parcel after 1989, we remand for it to do so.  If the Lampmans have not proven that they adversely possessed the disputed land after 1989, title should be quieted in the Prados unless the Graybills have fully performed under their contract for deed, in which case title should be quieted in the Graybills.

[¶42]   Reversed and remanded.