KAUTZ, Justice.
[¶1] This case is before the Court for a second time and involves a property dispute between Louise J. Galiher and her neighbors, Dennis and Vicki Johnson (hereinafter the Johnsons or Mr. Johnson). Following a bench trial, the district court entered a judgment vesting title to a portion of Ms. Galiher's property in the Johnsons by adverse possession. Ms. Galiher appealed that decision, and this Court reversed and remanded for the district court to consider the totality of the evidence, including statements Mr. Johnson made claiming he had permission to use the property. On remand, the district court again concluded title to the disputed property had vested in the Johnsons. Ms. Galiher appeals that judgment, arguing the district court's findings of fact were clearly erroneous, and the facts presented did not support a finding of adverse possession. We affirm.
ISSUES
[¶2] Ms. Galiher raises three issues in this appeal:
I. Whether the District Court's specific findings of fact in paragraph[ ] Nos. 56, 58, 61 and 63 are inconsistent with the evidence, clearly erroneous, and are contrary to the weight of the evidence.
*505 II. Whether the district court erred in finding that the Johnsons had established a prima facie case for adverse possession because when Mr. Johnson's out-of-court statements are considered as true, it is clear that the Johnsons never possessed the property under a "claim of right."
III. Whether the district court erred when it refused to consider any evidence of a neighborly accommodation.
FACTS
[¶3] In Galiher v. Johnson , 2017 WY 31, 391 P.3d 1101 (Wyo. 2017) ( Galiher I ), we engaged in a thorough discussion of the relevant evidence provided during the bench trial in this matter. For consistency's sake, we repeat those facts here:
The parties' dispute relates to Lot 21 and Lot 23 of the High Country subdivision in Teton County near the town of Jackson, Wyoming. In 1977, Johnson's wife Vicki and her former husband, Rick Hollingsworth, purchased a home situated on Lot 21. The couple divorced in 1984. Johnson met his wife in 1985 and married her the following year. In 1990, Hollingsworth conveyed his interest in the property to the Johnsons, who have continued to live there.
Lot 23 is directly south of Lot 21. Between 1978 and Galiher's purchase in early March of 2013, the ownership of Lot 23 had changed eight times.
....
On April 15, 2013, Galiher received the report of a survey she had commissioned and set out to examine the boundaries of Lot 23. In the extreme northwestern corner of her property she discovered what appeared to be a scattering of junk covered in part by weeds that were three feet high, as well as evidence of vehicles parking on her property. She then phoned the county planning and development office about the process she would have to pursue to have the junk removed. That inquiry led Jennifer Anderson, the planning office's code compliance officer, to send a letter to Johnson about the issue on April 22, 2013. Sometime after discussing the matter with Anderson, and telling her that prior owners had given him permission to use that corner of Lot 23, Johnson telephoned Galiher.
Johnson also informed Galiher that previous owners of Lot 23 had given his family permission to use that corner of her property for parking for a number of years, and he asked for permission to continue that use. He promised he would maintain it in a manner that was acceptable to her. Galiher denied him permission, but granted his request for forty-eight hours to remove his things. When Johnson then asked if guests could use it for overflow parking on those limited occasions when he was hosting a party, she told him she would have to think about it.
A week or more later,[1] Johnson called Galiher a second time and told her he was not going to remove his things from her property, and that he would continue to use it as he had been because he felt he had a right to be there. He did not tell her what prompted him to change his mind.
On May 11, 2013, Galiher saw that Johnson was still occupying her property, asked her friend Mary Martin to drive out to serve as a witness, and requested that a deputy sheriff be sent to the scene. While Galiher spoke to the deputy, Martin recognized Johnson as an old acquaintance from days when they both worked as department heads for Teton County. Consequently, she went to speak with him.
When Martin asked what he was doing, Johnson replied that he was getting his "stuff cleaned off this property" because his neighbor was upset. He also informed Martin that previous owners of the property had given him permission to use this small corner of it, and that he was really *506 upset the new owner was not being similarly neighborly.
On May 24, 2013, Galiher sued to quiet title to Lot 23, alleging that the Johnsons' use of the disputed portion of her property had been permissive. The Johnsons filed an answer and counterclaim seeking to quiet title to the disputed parcel based upon adverse possession on July 16. On June 20, 2014, they filed a motion for summary judgment, which the district court denied on December 1, 2014. The court concluded that contested issues of material fact existed with respect to whether [the] Johnsons' use of the disputed property was sufficiently open, notorious, exclusive, and hostile, and whether use of the property was permissive. A bench trial was thereafter held on July 28, 2015.
At the trial, Hollingsworth testified that when he and his then wife purchased the house on Lot 21, there were two retaining walls, the southern ends of which later were found to intrude slightly onto lot 23. After two to three years of living there, he converted the garage on the southern end of the house into a family room and built a new garage and driveway on the northern end of the home. He believed that from that time until his divorce his family parked exclusively in the new garage and driveway. However, on occasions when they hosted numerous guests, some would park in the disputed area when the old driveway was full.
Johnson testified that use of the disputed area increased somewhat after he married Hollingsworth's ex-wife. Each of them had a private vehicle and an employer-provided work vehicle. During winters, the slope of the northern driveway sometimes made it impractical to park there, so vehicles that could not be stored in the garage were parked in the disputed area. Their parking needs increased after 1988 due first to their children reaching driving age, and later to the Johnsons' decision to take in renters after the children moved out, as well as the periodic return of some of the children and their families to live in the home.
Johnson also testified that he placed other items on the disputed property to the east of the area used for parking. He kept construction materials there during remodeling work from 2000 to 2003, and he parked a pop-up camper there for five years. During the remodeling, he moved a small portable shed that he previously kept close to his house onto the disputed area, and he placed a short portable wooden boardwalk there. Neither of those items was secured to the ground.
....
Until Galiher had her property surveyed and her property lines marked, Johnson did not know where Lot 21 ended and Lot 23 began, and he thought that her predecessors in interest permitted his use of the disputed area out of a sense of reasonable neighborly accommodation.[2] He recognized all along that his various neighbors owned much of the land he was using for parking, and until his first conversation with Galiher, he had taken no steps to assert his [ ] ownership over any part of Lot 23.
On March 17, 2016, the district court issued its decision, in which it concluded the Johnsons had proven their adverse possession claim. The court identified the central question to be whether, in light of Johnson's satisfaction of his burden of producing evidence indicative of adverse possession, Galiher sufficiently rebutted that proof with evidence that Johnson's use of the disputed property was permissive or otherwise not hostile to Galiher's ownership.
Paragraph 9 in the "Findings and Conclusions" portion of the district court's decision recites:
Defendants' subjective intent or any other property owner's subjective intent is irrelevant in proving or disproving adverse possession. As such, the Court will *507 only rely on the admissible objective evidence and testimony presented at trial in considering Defendants' intent to establish adverse possession.
The court found that between 1977 and 1984, and between 1986 and 2013, neither the Hollingsworths nor the Johnsons asked for or received permission from any owner of Lot 23 to use the disputed property. Finding that Galiher had not shown by admissible evidence that such use was permissive or a neighborly accommodation, the court determined the Johnsons had adversely possessed the property since 1986 and therefore acquired title to it in 1996.
Galiher I , ¶¶ 4-17, 391 P.3d at 1102-06.
[¶4] Ms. Galiher appealed the decision, and this Court concluded the district court erred when it refused to consider Mr. Johnson's statements that he had permission from Ms. Galiher's predecessors to use the property. Id ., ¶ 30, 391 P.3d at 1107-08. Consequently, we reversed and remanded so the district court could "consider the statements together with the other testimony and evidence in the record." Id .
[¶5] On remand the parties agreed that no additional testimony or evidence was necessary. They submitted further briefing and proposed findings of fact and conclusions of law to the district court. Just as before, the district court determined the Johnsons made a prima facie showing they had adversely possessed the property since 1986. The court also found that Ms. Galiher failed to demonstrate the Johnsons' use of the property was permissive. The court discussed at length the statements Mr. Johnson made to Ms. Galiher, Ms. Anderson, the deputy sheriff, and Ms. Martin. In each instance, the court determined Mr. Johnson's assertion that he had permission to use the property "was untrue" and that Mr. Johnson made these statements out of self-preservation-avoiding county penalties, trespassing citations, and conflict with Ms. Galiher. The court also concluded the statements were inconsistent with Mr. Johnson's actions and long-standing use of the disputed property and, therefore, "did not accurately represent his subjective intentions" with respect to the property. Consequently, the court ordered that title to the disputed property had vested with the Johnsons. Id . at 584. Ms. Galiher filed a timely notice of appeal.
STANDARD OF REVIEW
[¶6] When reviewing a district court's decision following a bench trial, we use the following standard of review:
The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In considering a trial court's factual findings, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law. The district court's conclusions of law are reviewed de novo .
Graybill v. Lampman , 2014 WY 100, ¶ 25, 332 P.3d 511, 519 (Wyo. 2014) (quoting Helm v. Clark , 2010 WY 168, ¶ 6, 244 P.3d 1052, 1056 (Wyo. 2010) ).
DISCUSSION
District Court's Findings of Fact
[¶7] To prevail on an adverse possession claim, the claimant must show "actual, open, notorious, exclusive and continuous possession of the disputed parcel which is hostile and under claim of right or color of title." Graybill , ¶ 27, 332 P.3d at 519. However, if the claimant's use of the property is permissive, he cannot acquire title by adverse *508 possession because permissive use cannot be hostile. Hillard v. Marshall , 888 P.2d 1255, 1260-61 (Wyo. 1995).
[¶8] Ms. Galiher asserts the district court's conclusions about Mr. Johnson's claims of permission to use the property to Ms. Galiher, Ms. Anderson, the deputy sheriff, and Ms. Martin were contrary to the great weight of the evidence presented at trial and, therefore, clearly erroneous. The following colloquy took place during Mr. Johnson's cross-examination:
Q. .... Did you tell Mary Martin when she was there - - you know, who Mary Martin is, correct?
A. Yes.
Q. You knew her as of May - - I think it was May 19th when she showed up there, correct?
A. Yes.
Q. You were down there doing some kind of maintenance?
A. Yes.
Q. And did you tell her that you had had - - you had permission from prior owners to use that property?
A. I don't recall exactly what I told her.
Q. So if she was to say that you told her that you had permission, you would not be able to say that was wrong?
A. I would not.
Q. You would not be able to say that?
A. That's correct.
Q. And law enforcement, you did tell them that you had permission, correct?
A. Yes.
Q. Because that was your subjective belief at the time you talked to the officers in the spring of [20]15 [sic], correct?
A. Yes.
Q. And you told Ms. Galiher when you talked to her in April of [20]13 that you would get your stuff off if she would give you 48 hours, correct?
A. That's correct.
Q. And Jennifer Anderson, the county enforcement officer who sent you that letter, you told her you had permission from prior owners, correct?
A. Yes.
Q. And your position is the reason you said that is because you assumed so because nobody ever objected, right?
[Johnsons' counsel]: Asked and answered, your Honor.
COURT: I'll overrule. Go ahead and answer.
A. Yes.
Q. When you were living there and various owners would come and go - - and we have an exhibit - - a time line, there was [sic] quite a few owners of Lot 23 and the house on the hill, were there not?
A. I believe so.
Q. Did you ever even meet any of them?
A. No.
Q. You were appreciative of the fact when you knew that they owned this property that no one was objecting?
A. I took no views one way or the other.
Q. It was pretty helpful to you, correct?
[Johnsons' counsel]: Object to form, vague.
COURT: I'll overrule. Go ahead and answer if you have one.
A. I simply continued the use that was there when I got there.
Mr. Johnson also testified that after he spoke to Ms. Galiher the first time about the property, he spoke to his wife and Mr. Hollingsworth about having permission to use the property from prior owners:
A. I had questioned both Rick Hollingsworth and my wife and other people about did we have permission to use that property and they all said no, no one - - we never asked for it, it was never given, so given that I did some more research into Wyoming state law and I - - now my mind escapes me, and I came up with this adverse possession thing that perhaps this was a way for us to continue using the property we had used historically.
Ms. Galiher argues this testimony demonstrates Mr. Johnson had a sincere, but mistaken, belief he had permission to use the disputed property. Therefore, the court's conclusion that Mr. Johnson's statements *509 "were untrue" and made to avoid penalties and confrontations was clearly erroneous.
[¶9] We agree this evidence on its face does not explicitly show Mr. Johnson had a specific ulterior motive for making the statements. If this was the only evidence presented at the trial, we might agree that the district court's findings and conclusions are clearly erroneous. However, the totality of the evidence presented at trial provide a somewhat more complex factual scenario than demonstrated by the short passages cited above. While there is evidence Mr. Johnson may have assumed he had permission to use the property, it is undisputed that the Johnsons never received permission from any of the previous owners to use the disputed property. Instead, the Johnsons continuously used the property for their own purposes and none of the previous owners objected to their use. This is exhibited by Mr. Johnson's testimony quoted above, but also by Hazen Hatfield, a previous owner of Lot 23. Mr. Hatfield owned Lot 23 from 2001-2012. During that time, Mr. Hatfield observed cars being parked in the disputed area, and a retaining wall, small shed, and walkway on the property. Despite knowing he owned the disputed property, Mr. Hatfield took no action to prevent the Johnsons from using it. Mr. Hatfield testified he never spoke to the Johnsons about their use of the property-the Johnsons never asked for permission to use the disputed area and he never gave them permission to use or maintain the area.
[¶10] This testimony must be considered in conjunction with the evidence regarding the Johnsons' use of the property since 1977. Mrs. Johnson and Mr. Hollingsworth purchased Lot 21 in 1977 and began using the disputed property for parking. After the two divorced, Mrs. Johnson continued to use the area for parking. The Johnsons married in 1986, and they continued to use the disputed area on a more continuous basis for parking. Between 1986 and the filing of the lawsuit, the Johnsons also used the disputed area to store lumber and other building and landscaping materials and a pop-up camp trailer. They maintained the disputed area, removing snow from the area in the winter and clearing weeds in the warmer months. In 2002 or 2003 they redesigned the entryway to their home in a permanent manner to accommodate the primary parking for the home in the disputed area. They placed a walkway and a small storage shed on the disputed area.
[¶11] The district court was faced with sorting out potentially conflicting facts: (a) property use that on its face appears "hostile" and under a claim of right; (b) undisputed evidence the Johnsons did not have permission to use the disputed property; and (c) Mr. Johnson's after-the-fact statements that he had permission to use the property. This evidence necessarily required the district court to draw inferences to make its findings of fact. An inference is "[a] conclusion reached by considering other facts and deducing a logical consequence from them." Black's Law Dictionary 847 (10th ed.). When considering the inferences made by the district court, we give the prevailing party "the benefit of all favorable inferences that can fairly be drawn from the evidence, while disregarding conflicting evidence." Keever v. Payless Auto Sales, Inc. , 2003 WY 147, ¶ 7, 79 P.3d 496, 498 (Wyo. 2003).
[¶12] The district court determined that in each instance, Mr. Johnson's statement to the various individuals that he had permission to use the disputed property "was untrue." We do not find this conclusion clearly erroneous. The evidence is undisputed that the Johnsons did not have permission to use the disputed property and, therefore, Mr. Johnson's statements to the contrary were "untrue."
[¶13] However, the district court went on to make specific findings regarding Mr. Johnson's motivation in making those statements. There were two main inferences the district court could draw from Mr. Johnson's statements: 1) Mr. Johnson mistakenly assumed he had permission to use the disputed property; or 2) despite knowing he had not received permission, he claimed he had permission for some other reason. The district court concluded the latter-specifically, that he made the statements for self-preservation reasons. The district court reached this conclusion because Mr. Johnson's statements were contrary to his long-standing use *510 of the disputed property. The circumstances of those statements support the district court's inference of a motive to avoid conflict. They were made in response to somewhat confrontational circumstances. They were made long, long after the use began. They were made when the various prior owners of Lot 23 were out of the picture. While this inference is a closer call, we still cannot say the district court's conclusion was clearly erroneous. Taking Mr. Johnson's statements at face value would certainly be the path of least resistance, but the record also demonstrates that Mr. Johnson did not ask for permission. No owner of Lot 23 ever gave permission. At best, his basis for assuming permission was simply that no one had objected to his use of the disputed property. See Brennan v. Manchester Crossings, Inc. , 708 A.2d 815, 823 (Pa.Super. 1998) ("[A property owner] cannot sit passively, knowing of the adverse use and, then, claim to have given permission implicitly to the adverse possessor by his failure to object. Permission is an act of commission, not omission."). Mr. Johnson obviously wanted to continue using the property the way he had used it since at least 1986. "A reviewing court will not set aside a court's findings merely because it might have reached a different result." Keever , ¶ 7, 79 P.3d at 498. There is evidence to support more than one inference and we cannot say that, after reviewing the totality of the evidence, we are "left with the definite and firm conviction that a mistake has been committed." Helm , ¶ 6, 244 P.3d at 1056. Therefore, the district court's findings of fact were not clearly erroneous.
Prima Facie Showing of Adverse Possession
[¶14] Ms. Galiher argues the district court erroneously concluded that the Johnsons made a prima facie showing of adverse possession at trial. Her argument is based exclusively on her assertion that the district court's conclusions about Mr. Johnson's statements were clearly erroneous. Since we have found the district court's findings of fact were not clearly erroneous, it stands to reason the district court's conclusion that the Johnsons made a prima facie showing of adverse possession is also not erroneous.
[¶15] To establish adverse possession, the Johnsons were required to demonstrate "actual, open, notorious, exclusive and continuous possession of the disputed parcel which is hostile and under claim of right or color of title." Graybill , ¶ 27, 332 P.3d at 519. "Possession is hostile when the possessor holds and claims property as his own, whether by mistake or willfully." Murdock v. Zier , 2006 WY 80, ¶ 10, 137 P.3d 147, 150 (Wyo. 2006). Further, the Johnsons must show they possessed the property in this manner for at least ten years. Id. ; Wyo. Stat. Ann. § 1-3-103 (Lexis Nexis 2017). The test for adverse possession "imposes shifting burdens upon the parties." Helm , ¶ 8, 244 P.3d at 1057.
When there is no clear showing to the contrary, a person who has occupied the land for the statutory period, in a manner plainly indicating that he has acted as the owner thereof, is entitled to a presumption of adverse possession; and the burden shifts to the opposing party to explain such possession. However, if a claimant's use of the property is shown to be permissive, then he cannot acquire title by adverse possession.
Id . (quoting Addison v. Dallarosa-Handrich , 2007 WY 110, ¶ 11, 161 P.3d 1089, 1091-92 (Wyo. 2007) ). "Considering the nature and extent of the material facts associated with the elements of a claim of adverse possession, this Court considers an adverse possession action to be 'peculiarly factual in nature.' " Braunstein v. Robinson Family Ltd. Partnership LLP , 2010 WY 26, ¶ 19, 226 P.3d 826, 835 (Wyo. 2010).
[¶16] There is no dispute the Johnsons had open, notorious, exclusive and continuous possession of the disputed property for over ten years. The only disputed issue is whether the Johnsons possessed the property with the requisite hostility and under a claim of right. In Galiher I , we explained that:
A hostile possession or use is one that amounts to an assertion of ownership adverse to that of a record owner. It must be so incompatible with or so in defiance of the rights of the true owner that an ordinarily *511 prudent owner would be on clear notice that his ownership is in jeopardy, that the claimant intends to possess the property as his own, and that the owner should take some action to protect his title.
Galiher I , ¶ 20, 391 P.3d at 1106 (emphasis in original). Because the possession must be with the intent to assert an adverse claim against the true property owner, "the intention of the parties involved most often is controlling with doubtful situations to be submitted to the trier of facts." Braunstein , ¶ 19, 226 P.3d at 835. The party's intent may be established by words or acts. Id . However, a claimant must introduce evidence that his "intent was objectively made manifest by his observable words or actions" and, therefore, he cannot rely solely on testimony of his subjective intent. Id . ; Galiher I , ¶ 21, 391 P.3d at 1106. "While the words of the claimant should be taken into consideration, intent as to character of possession may be better ascertained by the acts of possession." Rutar Farms & Livestock, Inc. v. Fuss , 651 P.2d 1129, 1135 (Wyo. 1982).
[¶17] After considering all of the evidence, including Mr. Johnson's statements about permission, the district court concluded that the Johnsons' "dominion and use of the [d]isputed [p]roperty would have put any of the owners of Lot 23 on notice that the [d]isputed [p]roperty was being controlled by [the Johnsons], and that they were claiming exclusive ownership of the [d]isputed [p]roperty." The record supports this conclusion. The Johnsons used the disputed property as a parking area, and on average between two and four vehicles were parked in the area daily since 1986. They also maintained the area, removing snow in the winter and weeds in the summer. A permanent retaining wall had been placed on the disputed area before the property was even purchased by Mrs. Johnson and Mr. Hollingsworth. The Johnsons placed wooden walkways and a shed on the disputed area and used the area for storing building and landscaping materials. Most significantly, the Johnsons made permanent structural changes to their home based on their use of the disputed area. All of these activities are incompatible with the rights of the record owner of Lot 23, and a reasonably prudent landowner would recognize this use puts his ownership rights in jeopardy. See Graybill , ¶ 36, 332 P.3d at 522. Therefore, the Johnsons made a prima facie showing of adverse possession and the burden shifted to Ms. Galiher to demonstrate the Johnsons' use was permissive. Helm , ¶ 8, 244 P.3d at 1057. Because the district court determined Mr. Johnson's statements regarding permission did not accurately exhibit his intent with the property, Ms. Galiher failed to convince the court the Johnsons' use was permissive.
[¶18] Even if we agreed with Ms. Galiher that Mr. Johnson's statements showed he mistakenly assumed he had permission, our standard of review would not mandate reversal. As stated above, adverse possession claims are "peculiarly factual in nature." Braunstein , ¶ 19, 226 P.3d at 835. When there is evidence to support a claimant's prima facie showing, but there is also evidence to the contrary, the factual dispute "becomes a question of weight and credibility for the trier of fact." Hillard , 888 P.2d at 1260 (citing Meyer v. Ellis , 411 P.2d 338, 345 (Wyo. 1966) ("when there is a question of doubt as to whether the possession was adverse, it becomes a question of fact to be determined by the trier of the facts.").) The district court was faced with conflicting evidence regarding the element of hostility and was required to weigh the totality of the evidence and make a decision. The district court considered the extended time the Johnsons had exclusively used the property-over thirty years, the way they used the disputed property, the permanent changes they made to their home in reliance on use of the disputed property, and the undisputed fact they had never asked for or received permission from any of the prior owners of Lot 23 to use the disputed property. The court then had to balance those facts with the statements Mr. Johnson made when confronted by Ms. Galiher, Ms. Anderson, a sheriff deputy, and Ms. Martin, and the fact that the Johnsons never paid property taxes on the disputed parcel. See Cook v. Eddy , 2008 WY 111, ¶ 22, 193 P.3d 705, 712 (Wyo. 2008) ("non-payment of taxes by the adverse possessor or the payment of taxes by the owner of record, while a *512 consideration, does not circumvent an adverse possession claim").
[¶19] "We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law." Keever , ¶ 7, 79 P.3d at 498. The district court's decision is supported by the record, and Ms. Galiher does not argue it is erroneous as a matter of law. Although the evidence might also support some other conclusion, we will not disturb the findings made by the district court which heard the evidence as it unfolded and was in the best position to assess credibility. See Graybill , ¶ 25, 332 P.3d at 519. For that reason, we defer to the district court's conclusion that the Johnsons had adversely possessed the property since 1986.
Neighborly Accommodation
[¶20] Ms. Galiher's final argument is the district court erred when it did not find that the previous owners of Lot 23 were allowing the Johnsons to use the disputed property as part of a neighborly accommodation. This Court has recognized that a neighborly accommodation should defeat a claim of adverse possession and "to hold otherwise would be to adjudge that common neighborliness may only be indulged under penalty of encumbering one's property." Gray v. Fitzhugh , 576 P.2d 88, 90 (Wyo. 1978) ; see also Galiher I , ¶ 22, 391 P.3d at 1106. Ms. Galiher argues Mr. Hatfield and Mr. Johnson both testified consistently with a neighborly accommodation. Mr. Hatfield testified he knew he owned the disputed property but did not tell the Johnsons to stop using it because it "[s]eemed more convenient for them to park there" and he was trying to be a good neighbor. On cross-examination, Mr. Johnson was asked, "you simply thought you were using a neighbor's property who was being - - making a reasonable accommodation for you and was not objecting, correct?" He responded, "I believe that is fair, yes."
[¶21] While that isolated testimony may seem to support a neighborly accommodation, there are other facts that must be considered before reaching that conclusion. Most importantly, the record is clear that over the twelve years Mr. Hatfield owned Lot 23, he never had any communication with the Johnsons. In Galiher I , we discussed James C. Smith, Neighboring Property Owner , § 6:1 (November 2016 update), a treatise which analyzes "neighborly accommodations." Galiher I , ¶ 22, 391 P.3d at 1106. It recognizes that adverse possession disputes between neighbors and those involving strangers are treated differently due to the special relationship that often exists between neighbors. James C. Smith, Neighboring Property Owner , § 6:1 (November 2018 update). "[N]eighbors normally have some sort of social relationship or contact, whether friendly or otherwise. Generally, neighbors treat one another differently because of their status as neighbors." Id . Mr. Hatfield and the Johnsons did not have a "special relationship." In fact, they had no relationship at all. They never met or spoke to each other, and when Mr. Hatfield was asked if he knew Mr. Johnson he said, "I do not." A "neighborly accommodation" simply cannot be assumed-there must be evidence of communication or joint activity which demonstrates such an accommodation.
[¶22] The present situation also differs from that presented in Gray , where the Court relied on a neighborly accommodation to deny a claim of adverse possession. In Gray , the claimants had constructed a pond and recreational development that traversed the neighbor's irrigation ditches. Gray , 576 P.2d at 90. The evidence at trial showed that the neighbors had an "unwritten 'neighborly' agreement" that they would exchange use of certain lands on each other's property. Id . The Court determined that "neighborly agreement" covered the property at issue and, therefore, the claimants failed to demonstrate the requisite hostility for adverse possession. In the case at hand, the Johnsons never had an agreement-written or otherwise-with any of their neighbors. They certainly could not have had a mutual understanding with Mr. Hatfield as they had never spoken to him. To allow use of a neighborly accommodation in this situation would completely undermine the underlying basis of adverse possession. See Brennan, supra . Using Ms. Galiher's approach, a property owner *513 need only claim they were being neighborly to overcome a claim of adverse possession, no matter the extent of the claimant's open and notorious use of the property.
[¶23] Ms. Galiher's issue statement suggests the district court "refused" to consider evidence of a neighborly accommodation. That simply is not the case. In its findings of fact and conclusions of law, the district court explicitly stated: "[The Johnsons'] use of the [d]isputed [p]roperty from 1986 to 2013 was not permissive, nor was it part of a neighborly accommodation as a matter of convenience between [the Johnsons] and any owners of Lot 23". See Gray, 576 P.2d at 90. The district court considered the evidence and determined it did not support a conclusion that there was a neighborly accommodation. That decision is supported by the record and, therefore, is not clearly erroneous.
CONCLUSION
[¶24] The district court considered the evidence presented at trial, including the Johnsons' use and maintenance of the disputed property and Mr. Johnson's statements regarding permission, and determined the Johnsons demonstrated they had adversely possessed the disputed property since 1986. This conclusion is supported by the record; therefore, we affirm the judgment of the district court.

The record is unclear in this regard. Mr. Johnson testified that the second call took place about a week after the first, but he also testified that the second call followed a visit from a sheriff's deputy. The record reveals only one such visit, and it occurred on May 11, 2013. Mr. Johnson conceded that he may have told a visiting deputy he had been given permission to use the disputed property by previous owners of Lot 23.

One of those predecessors, Hazen Hatfield, confirmed that this was in fact his attitude towards the Johnsons' use of the disputed area. He owned Lot 23 from 2001 to 2012, and believed all along that he was simply being a good neighbor by allowing the Johnsons the convenience of parking in that area.